# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LORIE A. GILES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 11-1103 (ABJ) |
| | ) |
| TRANSIT EMPLOYEES CREDIT UNION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff has sued her former employer, Transit Employees Federal Credit Union (hereafter "TEFCU"), for wrongful termination. In her amended complaint, plaintiff claims that defendant discriminated against her and subjected her to retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count I), the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.01 *et seq.* (Count II), and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 (Count IV). Plaintiff also claimed that her wrongful discharge violated District of Columbia public policy (Count III), but that claim was dismissed by Order of October 10, 2012 [Dkt. # 30].

Defendant moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the remaining counts of the complaint. Def.'s Mot. for Summ. J. [Dkt. # 43]. Following a period of discovery, plaintiff filed an opposition, Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Dkt. # 49], defendant filed its reply [Dkt. 58], and plaintiff was permitted to file a surreply [Dkt. # 62]. Upon consideration of the parties' submissions and the relevant parts of

the record, the Court will grant defendant's motion and enter judgment accordingly. Plaintiff has articulated her own theory of why she was discharged, but at the summary judgment stage, she is obliged to come forward with the evidence to prove it, and this she has failed to do.

## I. BACKGROUND

As indicated in Plaintiff's List of Genuine Issues ("Pl.'s Facts") [Dkt. # 49-1], plaintiff admits the following facts that were set out in Defendant's Statement of Material Facts Not in Dispute ("Def's Facts") [Dkt. # 43-1]: plaintiff was hired as a temporary employee in December 2005 and as a full-time receptionist in September 2006. As a full-time employee, plaintiff participated in defendant's health insurance program and, as is the case for all participants, she paid 20 percent of the monthly premiums while defendant paid 80 percent. Plaintiff selected Blue Preferred Option 1/Preferred Dental/Drug coverage, and defendant's per-employee costs were the same for all employees who elected this plan.

Plaintiff suffers from Multiple Sclerosis for which she was treated while employed at TEFCU. From 2007 to October 2009, plaintiff received Tysabri infusion treatments, which were discontinued because of other health complications. Plaintiff used her accrued sick leave when she needed to take time off for the treatments and doctor's appointments, but she "never took a large amount of sick leave." Def's Facts ¶ 18. In her final year of employment, plaintiff "only took 37.5 hours of sick leave." *Id*.

In 2008, plaintiff "was counseled [] at least twice . . . for improper behavior towards [credit union] members. " *Id*. ¶ 24. On July 9, 2008, she was issued a verbal warning "for accosting a member and insisting that he return a pen when he attempted to leave the credit union after completing his business." *Id*. ¶ 25. On October 1, 2008, she was issued "a written warning" and a two-day suspension without pay "for insisting that a member exit the credit

union and reenter through the proper door." *Id*. ¶ 26. That year, plaintiff received "a substandard performance rating" of "Partial Achieved Requirements (PAR)." *Id*. ¶ 27.

In November 2009, Rita Smith replaced Percys Felder as the Credit Union's President and Chief Executive Officer, *id*. ¶ 31, and plaintiff was fired on November 24, 2009. Am. Compl. ¶ 28. Plaintiff "was advised by her doctor that she is 'totally disabled' " as of November 25, 2009. Def.'s Facts ¶ 35. "Plaintiff has not had a single job interview since she was terminated by the credit union." *Id*. ¶ 37.

Plaintiff denies the following facts:

- As a receptionist, plaintiff was "expected" to cross train for other duties, including those of a teller. Def's Facts ¶ 4.

- Plaintiff was unable to perform the duties of a teller and was limited to working as a receptionist. *Id*. ¶ 5

- Defendant's health insurance costs for its employees rose each year during and after plaintiff's employment. *Id*. ¶ 10.

- Plaintiff was moved from receptionist to scanning specialist in October 2008 because of her "subpar performance and [] repeated confrontations with members." *Id*. ¶ 28.

- Plaintiff received a rating of PAR in 2009 as to her scanning duties. *Id*. ¶ 29.

- Plaintiff "made repeated mistakes as the scanning specialist." *Id*. ¶ 30.

- As part of the change in management, a number of employees were terminated in late 2009 and 2010, two of whom were fired the same day as plaintiff. *Id*. ¶ 32.

- Plaintiff's medical condition "has been stable since she left the credit union." *Id.* ¶ 38.

Pl's Facts ¶ 2. These disputed facts are not material to any issue that would defeat summary judgment.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must support the assertion that no facts are in dispute by "citing to particular parts of materials in the record, including . . . affidavits." Fed. R. Civ. P. 56(c)(1)(A). The non-moving party has the burden "to produce admissible evidence establishing a genuine issue of material fact." *Bush v. District of Columbia*, 595 F.3d 384, 386 (D.C. Cir. 2010), citing *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to "make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. The Supreme Court defines material facts as "those that might affect the outcome of the suit under governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. The ADA and DCHRA

The ADA provides in pertinent part that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees . . . and privileges of employment." 42 U.S.C. § 12112(a). The DCHRA contains the same

proscription, *see* D.C. Code § 2-1402.11, and claims arising under the local statute are analyzed in the same manner as an ADA claim. *See Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001) ("We have considered decisions construing the ADA as persuasive in our decisions construing comparable sections of DCHRA.") (citing cases).

"[T]he two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's disability." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). Plaintiff points to no direct evidence that her employer discriminated against her due to her illness. In the absence of direct evidence of discrimination, an ADA or DCHRA claim may be shown through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

When, as here, an employer asserts a legitimate, non-discriminatory reason for the adverse decision, "the prima-facie-case aspect . . . [becomes] irrelevant" and the court is left with "one central inquiry" of whether plaintiff has "produced evidence sufficient for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi*, 525 F.3d at 1226, citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *see Francis v. District of Columbia*, 731 F. Supp. 2d 56, 77 (D.D.C. 2010), citing *Howard Univ. v. Green*, 652 A.2d 41, 45 n.3 (D.C. 1994) ("The familiar burden-shifting framework set forth in *McDonnell Douglas* applies [also] to [] claims under the DCHRA."); *Hamilton v. Howard Univ.*, 960 A.2d 308, 314 (D.C. 2008) ("In considering claims of discrimination under the DCHRA, we employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas* . . . .") (citation and internal quotation marks omitted). In assessing this question, the court is required to consider "all the evidence, which

5

includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action . . . ." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009), quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal quotation marks omitted).

Plaintiff "bears the ultimate burden of proving that discriminatory [or retaliatory] animus was the determining cause of the personnel action." *Lancaster v. Vance-Cooks*, --- F. Supp. 2d ---, 2013 WL 5366150, at *12 (D.D.C. Sept. 26, 2013), citing *Ford v. Mabus*, 629 F. 3d 198, 201 (D.C. Cir. 2010) (other citation omitted). Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981). However, courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), quoting *Milton v. Weinberger*, 696 F. 2d 94, 100 (D.C. Cir. 1982).

## C. ERISA

Section 510 of the ERISA makes it

> unlawful for any person to discharge . . . expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140. Plaintiff's ERISA claim is based on a theory of wrongful discharge. *See* Oct. 10, 2012 Mem. Op. at 3 (Plaintiff "belie[ves]" that the "sharp increase" in her medical costs increased defendant's costs and that defendant "[was] aware of and concerned about increased

insurance premiums[,]" which resulted in her firing "to prevent Plaintiff from continuing to exercise her right to medical-insurance benefits.") (quoting Am. Compl. ¶¶ 61-63).

"In order to recover under a § 510 interference claim, a plaintiff must prove that [the defendant] possessed a specific intent to interfere with her ERISA benefits." *Barnhardt v. Open Harvest Co-op*, 742 F.3d 365, 369 (8th Cir. 2014) (citations and internal quotation marks omitted) (alteration in original). "This specific intent to interfere means that the plaintiff's entitlement to ERISA benefits had 'a determinative influence' on the defendant's decision." *Id.*, quoting *Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 777 (8th Cir. 2004), quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000). Similar to an ADA claim, "a § 510 interference claim" may be shown by direct evidence or through the *McDonnell Douglas* framework. *Id.*

**D. Defendant's Reasons for Terminating Plaintiff**

Defendant has come forward with a legitimate non-discriminatory reason for the employment action that it took: it fired plaintiff based on her job performance.[1] Smith, TEFCU's President and CEO, testified in her deposition that although the ultimate decision to terminate plaintiff rested with her, she relied on the recommendation of the former CEO, Felder, concerning plaintiff and two other individuals who were fired the same day because she found

---

[1] Defendant also initially cited the credit union's fragile financial condition as a reason for plaintiff's termination, *see* Def.'s Facts ¶¶ 32-24, but during her deposition, Smith averred that plaintiff was fired for performance reasons only, not because of a reorganization. Smith Dep. [Dkt. # 49-3] at 90. Plaintiff complains about the inconsistencies, and she points to a December 2, 2009 reference letter that Felder wrote on plaintiff's behalf in which she attributed plaintiff's departure to "a re-organization made in November [when] a decision was made to eliminate the scanning position." Pl.'s Ex. I. The fact that Felder was willing to assist plaintiff with a letter of reference is not necessarily inconsistent with her sworn deposition testimony. In any event, the question now is whether plaintiff has come forward with any evidence that would support a finding that the stated reason for the firing was a pretext *for discrimination*, not whether there were also other non-discriminatory factors at work.

Felder "qualified to make that decision." Smith Dep. [Dkt. # 58-5] at 70. She further explained that "knowing that we had to make some changes, [Felder] would have made that decision" had Felder been in Smith's position.[2] *Id.* Smith testified that she does not recall knowing or being told that plaintiff had MS, *id.* at 50, and that she did not discuss plaintiff's medical condition with Felder, *id.* at 50-51.

In her deposition, Felder answered "no" when asked whether plaintiff had been "a good employee" and whether she had "performed her duties adequately" prior to Felder's resignation. Felder recounted that shortly before her resignation, plaintiff, in her position as scanning specialist, had "scanned [documents] to the wrong members' accounts." Felder Dep. [Dkt. # 58-4] at 60. Felder stated that she had discussed this error with Smith, as well as "the fact that [plaintiff] had held several positions at the credit union, and . . . had difficulty performing those duties." *Id.* Felder also stated that plaintiff was below average "in some areas." *Id.* at 61. She testified that she had considered plaintiff's performance reviews in recommending plaintiff's termination to Smith, and further testified as follows:

> Ms. Giles had held various positions in the credit union, and the reason why she had held those positions, or why she was transferred, was in an attempt to just keep her on board as an employee . . . . I like to give employees the benefit of the doubt. And my thought process was I would find a position that was suitable for her, that she could handle.

Felder Dep. at 61-62.

---

[2] Under the so-called "cat's paw" doctrine, an employee may seek "to hold [her] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, --- U.S. ---, 131 S.Ct. 1186, 1190 (2011); *see EEOC v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006) ("In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decision making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."). But for this theory to hold, there must be evidence of discriminatory animus on the part of the employee making the recommendation, who in this case, would be Felder, and plaintiff does not point to such evidence.

Felder testified that plaintiff was moved to the scanning specialist position since "she [had] not perform[ed] the duties in prior positions to my expectations." *Id*. at 62. She stated that plaintiff's MS "was not something that I dwelled on" and that her recommendation was not based on plaintiff's condition. *Id*. at 65. Plaintiff told Felder that she had MS sometime "shortly after she started working" at the credit union but Felder testified that other than the fact that plaintiff "generally dragged her leg a little, slightly" when she was hired, she observed no other symptoms. *Id*. at 67.

Smith's description of the discussion about plaintiff's performance was less detailed than Felder's, but she echoed the most salient point: "The only mention of [plaintiff's] performance was when we were deciding that she wouldn't work out long term with TEFCU. And the only thing I remember vividly sticking out to me . . . was that there was this large scanning project [that] plaintiff mis-scanned members' information into another person's account. And it was a huge project, and it was damaged severely by her mis-scanning." Smith Dep. at 51.

### E. Plaintiff's Rebuttal

With that evidence in the record, the onus shifted to plaintiff to point to facts that would demonstrate that the employer's explanation was not worthy of belief, or there was another, discriminatory motive at work. At the outset, plaintiff questions the veracity of defendant's asserted reasons in view of the written performance evaluations she received, *see* Pl.'s Facts ¶¶ 29, 32-49, and she presents evidence disputing whether her conduct amounted to a firing offense, *see* Decl. of Stefan Bradham ¶¶ 12-18 [Dkt. # 49-9]. But the court's role is not to act as "a super-personnel department that reexamines an entity's business decisions," *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation omitted); it "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach*, 86 F.3d at 1183

(citation and internal quotation marks omitted). Hence, "the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Id*. (citation and internal quotation marks omitted) (alterations in original). The court is concerned only with "[t]he ultimate question [of] whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive . . . does not necessarily establish that the plaintiff's proffered reason . . . is correct.' " *Reeves*, 530 U.S. at 146-47, quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524 (1993).

Plaintiff specifically attributes her termination to the fact that the company's health benefits costs "skyrocketed" while she was employed at TEFCU, Pl.'s Opp'n at 6, and "because [defendant] believed she was causing its health-insurance costs to increase." *Id*. at 26. Even if she could prove this charge, it would not add up to a violation of the ADA, though. To obtain a favorable verdict on the ADA claim, plaintiff must produce evidence that her *disability* was the specific motivation for her termination. Plaintiff states that despite her worsening illness, "[she] was not prevented from performing [the] required duties of her job," Pl.'s Facts ¶ 25, and the parties agree that plaintiff was able to use her accrued sick leave to attend doctor's appointments and to receive treatments. Plaintiff has proffered no evidence from which a reasonable jury could find or infer that her MS was the motivating factor behind her termination: she has not rebutted defendant's evidence showing that the ultimate decision-maker, Smith, did not even know about her illness, and that her health issues did not factor into Felder's recommendation. So the court will grant summary judgment to defendant on the ADA and DCHRA claims. *See, e.g., Tramp v. Associated Underwriters, Inc.*, No. 8:11CV371, 2013 WL 3071258 (D. Neb. June 17, 2013) (dismissing ADA claim since plaintiff's "argument concedes that [d]efendant terminated her to save health care costs, and not because she was disabled."); *South v. NMC*

10

*Homecare, Inc.*, 943 F. Supp. 1336, 1341 (D. Kan. 1996) ("Discharging an employee merely because his physical infirmities . . . impact company insurance premiums . . . does not implicate the ADA.").

As for the ERISA count, the Court finds that plaintiff has produced no evidence from which a reasonable jury could find or infer that the cost of her health insurance coverage was the motivating factor behind the decision to terminate her. While plaintiff admits that she has not proved that her personal medical expenses were "actually . . . driving up [defendant's] insurance costs," she argues that "the relevant inquiry is not whether Ms. Giles actually was driving up insurance costs, but 'whether the employer honestly and reasonably believed that' Ms. Giles was the cause of its rising insurance premiums." Pl.'s Opp'n at 26, quoting *Brady*, 520 F.3d at 496. But she has come forward with no evidence on that point either. Notwithstanding plaintiff's assertion that "there is substantial evidence that TEFCU did believe that [plaintiff] *would* and *did* cause its health-insurance costs to rise," *id*. (emphasis in original), no evidence has been adduced on that point, and no evidence ties the employment decision to the company's insurance premiums.[3]

Smith testified that when she became CEO in November 2009 -- when plaintiff was fired -- the company's health insurance contract was already in place. It was not subject to renewal

---

[3] Plaintiff blames her lack of proof on "TEFCU's apparent spoliation of health-insurance invoices and communications," Pl.'s Opp'n at 26, which is the subject of her contested pending motion for discovery sanctions [Dkt. # 50]. But there is sufficient documentary evidence in the record about the company's health insurance premiums, which came from the insurer itself, to negate plaintiff's theory. Furthermore, since plaintiff did not raise an ERISA claim until three years after her termination, there was no reason why the litigation hold should have covered all documents related to the company's health insurance costs (unlike the documents related to plaintiff's disability claim initiated shortly after her termination). And the documents plaintiff received from CareFirst show that had she received the insurance pricing information from defendant as she requested, the outcome of this case would be the same. Hence, the court finds this argument unavailing. Furthermore, it finds no grounds for imposing sanctions and will deny plaintiff's motion for discovery sanctions as moot.

until August or September of 2010, and she said, "the only time that we would even discuss healthcare would be at renewal[.]" Smith Dep. at 29.

Plaintiff points to the following portions of Felder's testimony, though, to advance the argument that defendant "was aware of [p]laintiff's [MS] and of the [costly] treatments she received." Pl.'s Opp'n at 27.

> Q Do you think that Ms. Giles's inclusion on TEFCU's health insurance raised the rates?
> A I wouldn't have any way of knowing that specifically.
> Q Do you think she used her health insurance more than other people?
> A I have no -- I don't know.
> Q You knew about her use of prescription drugs for MS; is that right?
> A Yes. Uh-huh.
> Q Something that most employees didn't have to worry about; is that right?
> A They would -- I would think most employees would use prescription drugs.
> Q But not for MS.
> A No.
> Q Do you know if those prescription drugs were expensive?
> A I can only go by what Ms. Giles said, that they were costly.
> Q So she told you they were expensive?
> A Yes.
> Q And did she explain that she was receiving infusions?
> A She told me that she was receiving some type of treatment. I don't know if they were infusions or not.
> Q Did she explain what kind of treatment she was receiving?
> A Something to help her with the MS and control it more.
> Q Did she tell you, for instance, if she was going to the cancer ward to get infusions?
> A I really don't recall that.

Felder Dep. at 102-03. This exchange does not confirm plaintiff's theory. Felder had no knowledge about the impact, if any, plaintiff's medical issues had on the company's health care costs, and she merely accepted plaintiff's word that her prescription drugs were expensive. Felder Dep. at 102. Plaintiff has proffered no evidence beyond her self-serving deposition testimony to show that her treatments or prescriptions made her more expensive to her employer than any other employee who participated in the same insurance plan, and defendant has

produced records from which a reasonable jury could find that she was not. *See* Def.'s Ex. 5 [Dkt. # 43-6] (CareFirst/Blue Cross group rates); Pl.'s Dep. [Dkt. # 58-8] at 19-21, 25-29. In addition, defendant notes that despite plaintiff's deposition testimony that each infusion treatment costs $4,000, she has not produced any documentation, *i.e.*, the explanation of benefits ("EOB"), showing this to be so, *see* Def.'s Reply at 8, n.8, 9; nor has she produced any evidence showing what portion of those costs the company or its insurance carrier actually paid.

Furthermore, there are other reasons why no reasonable jury could find that plaintiff's medical costs were the motivating factor behind plaintiff's termination. First, plaintiff had undergone the "expensive" treatments each month for the two years before her termination and, for reasons unrelated to the cost, she stopped receiving the treatments in October 2009, while she was still employed. Def.'s Undisputed Facts ¶¶ 14, 19. So there was no logical reason for defendant to focus on the costs of plaintiff's treatments at the time she was fired.

Second, defendant explains that since it was not self-insured, it had no way of knowing what treatments plaintiff received or how much they cost since her bills were paid by CareFirst/Blue Cross. *See* Def.'s Reply at 8-9; Def.'s Summ. J. Mem. at 12. And the only person in a decision-making position to whom plaintiff volunteered any information on that topic has testified that she did not consider plaintiff's health care costs when she recommended plaintiff's termination. Indeed, her testimony reveals that she did not consider a need for what was vaguely characterized as "expensive" medication to be particularly remarkable.

Third, plaintiff has proffered no evidence to support her allegations that defendant's insurance premiums "skyrocketed" during the years of her employment and dramatically declined after her termination, and the defendant's insurance records belie plaintiff's uncorroborated claims. *See* Def.'s Reply at 10-19 (citing Exs. 8, 9, 10, 11, 12). It is true that

defendant's monthly per-employee premiums for the plan plaintiff chose increased approximately $70 each year that plaintiff was employed, and that they declined by $12 in 2010 due to a new option offered by CareFirst that "was slightly cheaper for all employees." Def.'s Facts ¶ 10, n.2, citing Ex. 5. But defendant's total monthly premium costs actually increased to $10,667.20 in August 2010 from $7,239 in August 2009. Def.'s Reply at 12, citing Ex. 8. And since the company's policy premiums covered the group as a whole, and not plaintiff individually, there is no evidence from which a reasonable jury could attribute any fluctuations in health care costs directly to plaintiff's medical treatments and then infer the requisite animus. Indeed, the records plaintiff obtained from the insurer reflect that it based TEFCU's rate increases on the community as a whole, not the costs actually experienced by the employer.[4]

In sum, plaintiff posits that defendant "believed Ms. Giles caused [its] health-insurance costs to increase," Pl.'s Opp'n at 23, but she has not pointed to any evidence in the record that would indicate that anyone at TEFCU had that belief or that they were aware of any facts that would support such a belief or from which a reasonable inference may be drawn. Plaintiff's speculative assertions are simply not enough to defeat summary judgment on the ERISA claim. *See Dist. Intown Props. Ltd. P'ship v. Dist. of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record."); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Although, as a rule, statements made by the party opposing a motion for

---

[4] In each renewal notice, CareFirst explains its "rating methodology" as "based on the community market [consisting] of all small groups located in the District of Columbia area with fewer than 51 contracts." Def.'s Ex. 9; Pl.'s Ex. C. Since "claims experience is unpredictable from year to year[,] renewal rates are calculated using the community claims experience and the average group age, projected forward with a healthcare inflation factor." *Id*.

summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule.").

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment on counts I, II, and IV of the amended complaint is granted, and plaintiff's motion for discovery sanctions is denied as moot. A separate order accompanies this Memorandum Opinion.

/s/ Amy B. Jackson

AMY BERMAN JACKSON
United States District Judge

Dated: March 27, 2014